IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| DEBRA EIDE,<br><br>    Plaintiff,<br><br>v.<br><br>SYNGENTA AG, SYNGENTA CROP PROTECTION LLC, AND CHEVRON USA INC.,<br><br>    Defendants. | No. _____<br><br><br><br><br>**PLAINTIFF'S COMPLAINT AND JURY DEMAND** |

## COMPLAINT

Plaintiff Debra Eide bring this Complaint against Defendants Syngenta AG, Syngenta Crop Protection LLC, and Chevron USA Inc., and alleges as follows:

## INTRODUCTION

1.      Paraquat is a synthetic chemical compound that has been developed, registered, manufactured, distributed, sold for use, and used in Paraquat products on fields in the United States since the 1960s, including Iowa.

2.      The manufacturers and sellers of Paraquat, Syngenta AG, Syngenta Crop Protection LLC, and Chevron USA, Inc. ("Defendants"), concealed the dangers of Paraquat and knew or should have known Paraquat is toxic and causes an incurable degenerative, debilitating neuromuscular disorder, Parkinson's Disease.

3.      Plaintiff Eide was around at the time of use of the Defendants' Paraquat products consistently over the course of many years.

4.      Plaintiff Eide now suffers from Parkinson's disease caused by prolonged exposure to the Defendants' Paraquat products.

5.      Defendants knew or should have known that consumers, including Plaintiff Eide, would be exposed to Paraquat when its Paraquat products were used as directed and/or in a reasonably foreseeable manner.

6.       Defendants knew or should have known that this exposure significantly increases the risk of its consumers and those exposed to Paraquat developing Parkinson's Disease.

7.      Despite this knowledge, Defendants did not adequately warn Plaintiff Eide or Paraquat  consumers that their use of and/or exposure to Paraquat significantly increased their risk of  developing Parkinson's Disease.  Nor did Defendants (a) adequately test Paraquat to, among other  things, determine the nature and extent of exposure under all relevant conditions, including when  mixed in particular formulations, or (b) formulate or label Paraquat so to render such exposure  unlikely. Instead, Defendants sold Paraquat with complete disregard and reckless indifference to   the safety of Paraquat consumers and those exposed to Paraquat, such as Plaintiff Eide.

8.      Plaintiff Eide brings this case to recover from Defendants compensation for injuries and damages cause by the exposure to Defendants' Paraquat products under the following theories of liability: strict product liability – failure to warn; strict product liability – design defect; and negligence. Plaintiff Eide also seeks punitive damages and reasonable attorney's fees.

## THE PARTIES

### Plaintiff

9.      Plaintiff Eide is and was citizen of the United States and the State of Iowa at all times relevant to this action.

10.     Plaintiff Eide is sixty-nine years old and has lived on farms or next to farms in Iowa and Minnesota her entire life, and has worked on her family members' farms off and on for much of her life. She was exposed to Paraquat when it was mixed, loaded, applied, and/or cleaned; as a result of spray drift; and/or as a result of contact with sprayed plants. As a direct and proximate result of exposure to Paraquat, Plaintiff Eide is at an increased risk for developing Parkinson's Disease and is in need of regular monitoring. Plaintiff Eide did not know that Paraquat can cause Parkinson's Disease.

### Defendants

11.     Defendant Syngenta AG ("SAG") is a foreign corporation with its principal place of business in Switzerland.

12.     Defendant Syngenta Crop Protection LLC ("SCP") is a Delaware limited liability company with its principal place of business in North Carolina. SCP is a wholly-owned subsidiary of Defendant SAG.

13.     Chevron USA Inc. ("Chevron") is a Pennsylvania corporation with its principal place of business in San Ramon, California.

14.     U.K. manufacturer Imperial Chemical Industries Ltd., a/k/a Imperial Chemical Industries PLC ("ICI") first introduced Paraquat to world markets in or about 1962 under the brand name GRAMOXONE®.

15.     In or about 1971, ICI created or acquired a wholly-owned U.S. subsidiary organized under the laws of the State of Delaware, which was ultimately known as ICI Americas Inc. ("ICI Americas").

16.     Chevron Chemical Company was a corporation organized under the laws of the State of Delaware. Pursuant to distribution and licensing agreements with ICI and ICI Americas,

3

Chevron Chemical Company had exclusive rights to distribute and sell Paraquat in the United States and did, in fact, manufacture, formulate, distribute, and sell Paraquat in the United States, including in Iowa and for use in Iowa, from approximately 1964 to 1986.

17.     Chevron is the successor-in-interest to Chevron Chemical Company. At all relevant times, Chevron Chemical Company acted as the agent of Chevron in selling and distributing Paraquat in the United States and Iowa, and was acting in the scope of its agency.  Chevron is liable for the acts of its agent.

18.     From approximately 1964 to 1986, pursuant to distribution and licensing agreements between Chevron Chemical Company, SAG's and/or SCP's predecessors-in-interest,  ICI and ICI Americas, manufactured some or all of the Paraquat that Chevron Chemical Company  distributed and sold in the United States, including in and for use in Iowa.

19.     During this same time, pursuant to distribution and licensing agreements between  and among them, ICI, ICI Americas, and Chevron Chemical Company acted in concert to register,  manufacture, formulate, distribute, and sell (through Chevron Chemical Company) Paraquat for  use in the United States, including in and for use in Iowa. Their respective successors-in-interest,   SAG, SCP, and Chevron, are jointly liable for the resulting injuries alleged herein.

20.     After 1986, SCP (and/or its predecessors-in-interest) sold and distributed, and  continue to sell and distribute, Paraquat in the United States, including in and for use in Iowa.

21.     As a result of corporate mergers and restructuring, SAG is the successor-in-interest  to ICI, and SCP is the successor-in-interest to ICI Americas, Inc.

22.     From approximately 1964 to present, the SCP and SAG (collectively,

4

"Syngenta"),  or their predecessors-in-interest, have manufactured, formulated, distributed, and sold Paraquat for  use in the United States, including in and for use in Iowa.

23.     At all relevant times, each Defendant was the agent, servant, employee, joint venturer, alter ego, successor-in-interest, and predecessor-in-interest of each of the other, and was acting within the course and scope of their agency, service, joint venture, alter ego relationship, employment, and corporate relationship. The acts of each Defendant are legally attributable to each and every other Defendant.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because (a) the matter in controversy exceeds the sum or value of $75,000 and (b) the parties involved are citizens of different states.

25.     This Court has personal jurisdiction over the Defendants because they have sufficient minimum contacts in the State of Iowa to render exercise of jurisdiction over the Defendants proper.

26.     Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events giving rise to the claims occurred within the Southern District of Iowa.

## FACTUAL ALLEGATIONS

### Paraquat Development and Types of Exposure.

27.     Defendants' product, Paraquat, has been used in the United States on fields of more than 100 crops to control weeds and dry plants since 1964.

28.     The Defendants' Paraquat products were used multiple times per year on the same fields. At all relevant times, the use of Defendants' Paraquat products on these fields were intended or directed by, known, and/or reasonably foreseeable to the Defendants.

29.     The Defendants' Paraquat products were typically sold as liquid concentrates that would be mixed with water and sprayed in the fields. At all relevant times, the use of Defendants' Paraquat products in this manner was intended or directed by, known, and/or reasonably foreseeable to the Defendants.

30.     Paraquat can be applied using knapsack sprayers, hand-held sprayers, aircraft, trucks with pressurized tanks, and tractor-drawn pressurized tanks. At all relevant times, the use of such equipment for that purpose was intended or directed by and/or reasonably foreseeable to Defendants.

## Paraquat Regulation Under State and Federal Law.

31.     Distribution, sale, and use of pesticides in the United States is regulated by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). *See* 7 U.S.C. § 136.

32.     Pesticides must be registered with the Environmental Protection Agency ("EPA") prior to distribution, sale, or use of such products. *See* 7 U.S.C. § 136a.

33.     Pesticides sold or distributed in Iowa must also be registered under the Pesticide Act of Iowa. *See* Iowa Code § 206.12 *et seq*.

34.     The Defendants' Paraquat products were registered in both Iowa and the United States pursuant to the respective codes.

35.     The EPA bases its registration decision on the data submitted by the registrant. The EPA does not perform product tests. FIFRA generally requires the registrant to perform a

variety of health and safety tests to determine potential exposure, toxicity, and other adverse effects.

36.     However, the registration does not mean the EPA is endorsing its safety. If the EPA decides to register the product, the EPA has determined that the product complies with labeling requirements; "will perform its intended function without unreasonable adverse effects on the environment; and when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(B)-(D). It does not provide assurances that the product is safe.

37.     FIFRA provides that "In no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

38.     FIFRA also provides that it is unlawful to sell a pesticide that is misbranded. 7 U.S.C. § 136j(a)(1)(E).

39.     Under FIFRA, a pesticide is misbranded if, among other things:

a.     "its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

b.     "the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

c.     "the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed

under section 136a(d) of this title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

40. Under the Pesticide Act of Iowa, a pesticide is misbranded if, among other things:

    a. "Its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular," Iowa Code § 206.2(18)(a);

    b. "If the labeling accompanying it does not contain directions for use which are necessary and if complied with adequate for the protection of the public," Iowa Code § 206.2(18)(b)(3);

    c. "If the label does not contain a warning or caution statement which may be necessary and if complied with adequate to prevent injury to living persons and other vertebrate animals," Iowa Code § 206.2(18)(b)(4); or

    d. "If in the case of an insecticide, nematocide, fungicide, or herbicide when used as directed or in accordance with commonly recognized practice it shall be injurious to living persons… to which it is applied, or to the person applying such pesticide." Iowa Code § 206.2(18)(b)(7).

41. Based on the preceding paragraphs, it is possible for a product registered by   EPA to be misbranded if the label contains false or misleading statements, inadequate instructions for use to protect the public, does not contain a warning statement adequate to prevent injury, or, in the case of a herbicide, is injurious to the person applying the pesticide when used in a commonly recognized practice.

42. Plaintiff Eide does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA;

accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of Paraquat or warnings about Paraquat, breached a duty to provide adequate packaging for Paraquat, or concealed, suppressed, or omitted to disclose any material fact about Paraquat or engaged in any unfair or deceptive practice regarding Paraquat, is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the Paraquat "misbranded" under FIFRA.

43.     Plaintiff Eide brings claims and seeks relief in this action only under state law. Plaintiff Eide does not bring any claims or seek any relief in this action under FIFRA.

**Paraquat is Toxic.**

44.     Paraquat is highly toxic to plants and animals. It injures and kills humans and animals by creating oxidative stress that causes cell degeneration and death.

45.     Inherent in Paraquat's chemical composition and structure are "redox properties." Paraquat is a strong oxidant that readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

46.     Paraquat's redox cycling in living cells interferes with cellular functions that are necessary to sustain life; *e.g.*, photosynthesis (in plants) and cellular respiration (in animals and humans). It also creates a "reactive oxygen species" known as superoxide radical. This is an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damages lipids, proteins, and nucleic acids—molecules that are essential components of the structures and functions of living cells.

47.     Because Paraquat's redox cycling can repeat indefinitely under the conditions typically present in living cells, a single molecule of Paraquat can trigger the

production of countless molecules of destructive superoxide radical.

48.    Defendants knew or should have known (a) of Paraquat's redox properties, since at least the 1930s, and (b) that Paraquat is toxic to cells because it creates oxidative stress through redox cycling, since at least the 1960s.

49.    Further, Defendants typically formulated their Paraquat concentrates to include surfactants, which were likely to further increase Paraquat's toxicity to humans by increasing its ability to remain in contact with or penetrate the skin, mucous membranes, and other epithelial tissues.

50.    These facts were not known to laypeople and consumers, including Plaintiff Eide, and they could not and did not know that Paraquat causes an increased risk of Parkinson's Disease.

**Paraquat Exposes Itself Through Several Routes, All of Which Were Foreseeable and Known to Defendants.**

51.    It was reasonably foreseeable that when Paraquat was used in the manner intended or directed, or in a reasonably foreseeable manner,

   a.    users and persons nearby would be exposed to Paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks;

   b.    persons who sprayed Paraquat or were in or near areas where it was being or recently had been sprayed would be exposed, including as a result of spray drift[1] and contact with sprayed plants; and

   c.    users and persons nearby would be exposed to Paraquat while the

---

[1] Spray drift is the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind.

spraying equipment was being emptied, cleaned, or cleared, including as a result of spills, splashes, and leaks.

52.    It was reasonably foreseeable that Paraquat could enter the human body:

a.    through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose, nasal passages, trachea, and conducting airways, particularly where abrasions, rashes, sores, or other tissue damage was present);

b.    through the olfactory bulb;

c.    through respiration into the lungs; and

d.    through ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

53.    It was reasonably foreseeable that once Paraquat entered the body, regardless of mechanism, it would enter the bloodstream and the brain (whether through the blood-brain barrier or to parts of the brain not protected by the blood-brain barrier).

**Paraquat Exposure Significantly Increases the Risk of Parkinson's Disease.**

54.    Paraquat raises the risk of Parkinson's Disease by more than 300%.

55.    Parkinson's is a progressive neurodegenerative disorder of the brain. Its characteristic symptoms are "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

56.    These primary motor symptoms often result in "secondary'' motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous,

11

or quiet  voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess   saliva and drooling caused by reduced swallowing movements.

57.     Non-motor symptoms, such as loss of or altered sense of smell; constipation; low  blood pressure on rising to stand; sleep disturbances; and depression, are present in most cases of  Parkinson's, often years before any of the primary motor symptoms appear. By the time motor  symptoms occur, significant neurological damage has already occurred.

58.     Parkinson's is commonly missed or misdiagnosed if symptoms—particularly early,  pre-motor symptoms—are not evaluated by a physician specializing in neuromuscular disorders  like Parkinson's.

59.     Parkinson's is incurable.  However, there are treatments that improve symptoms,  slow disease progression, improve the patient's quality of life, and reduce future medical expenses.   Thus, early diagnosis is both meaningful and important.

60.     Dopamine is a neurotransmitter (a chemical messenger that transmits signals from  one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of  motor function (among other things).

61.     A primary pathophysiological hallmark of Parkinson's is the selective degeneration  and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called  the substantia nigra pars compacta ("SNpc").  This decreases the production of dopamine.

62.     Once dopaminergic neurons die, they are not replaced.  And when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for  proper control of motor function, resulting in the motor symptoms of Parkinson's.

63.     The  presence  of Lewy  bodies (insoluble  aggregates of  a  protein called

lphasynuclein) in many of the remaining dopaminergic neurons in the SNpc is another one of the  primary pathophysiological hallmarks of Parkinson's.

64.    Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance  in the normal balance between oxidants present in cells and cells' antioxidant defenses. Oxidative  stress is a major factor in—if not the precipitating cause of—the degeneration and death of  dopaminergic neurons in the SNpc and the accumulation of Lewy bodies  in  the  remaining  dopaminergic neurons that are the primary pathophysiological hallmarks of Parkinson's.

65.    The same redox that makes Paraquat toxic to cells makes it toxic to dopaminergic  neurons.  Paraquat is a strong oxidant that interferes with the function of, damages, and ultimately  kills dopaminergic neurons by creating oxidative stress through redox cycling.

66.    Parkinson's is not known to occur naturally in any species other than humans. But  Parkinson's research is often performed using "animal models" in which scientists artificially  produce in laboratory animals conditions that show features of Parkinson's. Paraquat is one of  only a handful of toxins that scientists use to produce animal models of Parkinson's.

67.    Animal  studies  involving  various  routes  of  exposure  have  found  that Paraquat  creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the  SNpc, other pathophysiology consistent with that seen in human Parkinson's, and motor deficits   and behavioral changes consistent with those commonly seen in Parkinson's.

68.    Hundreds of *in vitro* studies have found that Paraquat creates oxidative stress

that results in the degradation and death of dopaminergic neurons (and many other types of animal cells).

69.     Epidemiological studies have found an association between Paraquat exposure and Parkinson's, including multiple studies finding at least a two- to five-fold increase in the risk of Parkinson's in populations with occupational exposure, compared to those without.

70.     These convergent lines of evidence (toxicology, animal experiments, and epidemiology) demonstrate that Paraquat exposure causes Parkinson's.

71.     Despite the evidence demonstrating this heightened risk and causal link, Defendants continue to sell Paraquat, without properly warning consumers, properly testing Paraquat, or changing the formulation to reduce the likelihood of exposure.

## COUNT I: PRODUCTS LIABILITY – FAILURE TO WARN

72.     Plaintiff Eide realleges and incorporates herein by reference the allegations of the preceding paragraphs.

73.     At all relevant times, Defendants were active in the U.S. Paraquat business and expected that Defendants' Paraquat products would be sold and/or used in the State of Iowa.

74.     Defendants developed, registered, manufactured, distributed, and sold for use Defendants' Paraquat products in the U.S., including Iowa.

75.     Plaintiff Eide's regular exposure to Defendants' Paraquat products resulted in Plaintiff Eide's injury and damages.

76.     Defendants knew or should have known its Paraquat products, when used in a manner intended or directed by or reasonably foreseeable to, would result in the users and others near the area of use to be exposed to Paraquat.

77.     Defendants' Paraquat products were designed, manufactured, formulated, and packaged in a way that was likely to cause the Paraquat products to be inhaled, ingested, and absorbed into the bodies of the users or persons nearby when the Paraquat products were being used.

78.     When inhaled, ingested, or absorbed into the bodies of the users or persons nearby, Paraquat was likely to cause or contribute to latent, cumulative, and permanent neurological damage, and repeated exposure to Paraquat products were likely to cause or contribute to neurodegenerative diseases, including Parkinson's Disease, to develop throughout time and present itself long after exposure.

79.     Defendants' Paraquat products were defective in a way that made them unreasonably dangerous when used in a manner intended or directed by or reasonably foreseeable to the Defendant in that:

   a.     They did not contain directions that would have made Defendants' Paraquat products unlikely to be inhaled, ingested, or absorbed into the bodies of its users or persons nearby when the products were being used; and

   b.     They did not contain a warning that when inhaled, ingested, or absorbed into the bodies of its users or persons nearby, Paraquat was likely to cause or contribute to latent, cumulative, and permanent neurological damage, and that repeated exposure to Paraquat was likely to cause or contribute to neurodegenerative diseases, including Parkinson's Disease, to develop throughout time and present itself long after exposure.

15

80.     The Defendants' Paraquat products were defective when they left the Defendants' control and entered the stream of commerce.

81.     At the time of manufacture, distribution, and/or sale of Defendants' Paraquat products, the risks were known or knowable based on generally accepted scientific and medical knowledge in their respective communities.

82.     Despite the Defendants' knowledge that their Paraquat products created a substantial risk of harm to its users or persons nearby at the time of use, they continued to place the products into the stream of commerce.

83.     Defendants knew that Plaintiff Eide and other consumers would not recognize these risks.

84.     It was foreseeable to Defendants that their failure to provide sufficient instructions and/or warnings, and their failure to timely, adequately, and appropriately disclose the causal relationship between Paraquat and Parkinson's Disease, would expose Plaintiff Eide to Paraquat and would cause her irreparable harm, including the increased risk of developing Parkinson's Disease.

85.     If Plaintiff Eide and those individuals around her using the Paraquat product had been provided with the appropriate information and warnings regarding the causal connection between Paraquat and Parkinson's Disease, they would have been able to make an informed decision about using an alternative product or not engaging in activity or being in areas which exposed to the Paraquat.

86.     At all relevant times, Plaintiff Eide's exposure to Defendants' Paraquat products was in a manner that was intended or directed by or reasonably foreseeable to Defendants.

87.     As a result, Defendants' Paraquat products failed to perform their intended function in a reasonable manner.

88.     Furthermore, the dangers of the defective condition outweighed the Paraquat products utility.

89.     Defendants' prevented Plaintiff Eide from discovering causal link between Paraquat and her injury by concealing their Paraquat products' defective condition.

90.     Defendants' conduct caused Plaintif Eide's injury and damages, including costs associated with necessary and ongoing   medical monitoring.

### COUNT II: PRODUCTS LIABILITY – DESIGN DEFECT

91.     Plaintiff Eide realleges and incorporates herein by reference the allegations of the preceding paragraphs.

92.     Defendants developed, registered, manufactured, distributed, and sold for use Paraquat in its Paraquat products in the U.S., including the State of Iowa.

93.     Defendants intended and expected that Defendants' Paraquat products would be sold and used in the State of Iowa.

94.     Plaintiff Eide regularly was nearby during use of Defendants' Paraquat products in Iowa resulting in Plaintiff Eide's repeated and prolonged exposure to Paraquat.

95.     The defective condition of Defendants' Paraquat products caused them to be unreasonably dangerous even when used in a manner intended or directed by or reasonably foreseeable to Defendants, to wit:

    a.     Defendants' Paraquat products were designed, manufactured, formulated, and packaged in a way that was likely to cause the Paraquat products to be

inhaled, ingested, and absorbed into the bodies of the users or persons
nearby when the Paraquat products were being used; and

b.  When inhaled, ingested, or absorbed into the bodies of the users or persons
nearby, Paraquat was likely to cause or contribute to latent, cumulative,
and permanent neurological damage, and repeated exposure to Paraquat
products were likely to cause or contribute to neurodegenerative diseases,
including Parkinson's Disease, to develop throughout time and present
itself long after exposure.

96.     The Defendants' Paraquat products were defective when they left the Defendants'
control and entered the stream of commerce.

97.     The potential risks that were known or knowable in light of the scientific
and  medical knowledge that was generally accepted in the scientific and medical communities
at the  time of the manufacture, distribution, and/or sale of the products.

98.     The potential risks, including the substantial risk of Parkinson's Disease,
presented  a substantial danger to Plaintiff Eide when Defendants' Paraquat products were  used
or misused in an intended or reasonably foreseeable way.

99.     Ordinary consumers, including Plaintiff Eide, would not have  recognized these
potential risks, and Defendants knew this.

100.    At the time that Plaintiff Eide's exposure to Defendants' Paraquat,
Defendants  knew or should have known of the clear causal connection between Paraquat and
Parkinson's  Disease, but they did not disclose this information to Plaintiff Eide and did not warn
of the significantly  greater risk of Parkinson's Disease posed by their product.

101.    Despite the Defendants' knowledge that their Paraquat products created a substantial risk of harm to its users or persons nearby at the time of use, they continued to place the products into the stream of commerce.

102.    The foreseeable risks of harm posed by the Paraquat product could have been reduced or avoided by the adoption of a reasonable alternative design by Defendants.

103.    At all relevant times, Plaintiff Eide's exposure Defendants' Paraquat products was in a manner that was intended or directed by or reasonably foreseeable to Defendants.

104.    As a result, Defendants' Paraquat products failed to perform their intended function in a reasonable manner.

105.    Furthermore, the dangers of the defective condition outweighed the Paraquat products' utility.

106.    Defendants' prevented Plaintiff Eide from discovering causal link between Paraquat and her injury by concealing their Paraquat products' defective condition.

107.    Defendants' conduct caused Plaintiff injury and damages, including costs associated with necessary and ongoing  medical monitoring.

**COUNT III: NEGLIGENCE**

108.    Plaintiff Eide realleges and incorporates herein by reference the allegations of the preceding paragraphs.

109.    At all relevant times, Defendants were in the business of designing, manufacturing, and selling Paraquat within the U.S., including the State of Iowa.

110.    Defendants intended and expected that Defendants' Paraquat products would be sold and used in the State of Iowa.

111.    Plaintiff Eide regularly was nearby during use of Defendants' Paraquat products in Iowa resulting in Plaintiff Eide's repeated and prolonged exposure to Paraquat.

112.    While designing, manufacturing, and distributing Paraquat for use in Defendants' Paraquat products, Defendants owed a duty to exercise ordinary care for the health and safety of people that the Defendants could reasonably foresee being exposed to Paraquat.

113.    While designing, manufacturing, packaging, and distributing Paraquat for use in Defendants' Paraquat products, it was reasonably foreseeable and in the exercise of ordinary care that Defendant knew, or should have known, persons using products or persons nearby when the products were being used would inhale, ingest, or absorb Paraquat.

114.    While designing, manufacturing, packaging, and distributing Paraquat for use in Defendants' Paraquat products, Defendants knew or should have known that inhaling, ingesting, or absorbing Paraquat was likely to cause or contribute to latent, cumulative, and permanent neurological damage, and neurodegenerative diseases, including Parkinson's Disease, were likely to develop over time and present itself long after exposure as a result of repeated exposure to Paraquat.

115.    Defendants have a duty to disclose any complaints or concerns about the safety or performance of their Paraquat products discovered in the monitoring of their products.

116.    Defendants breached these duties by:

      a.    Failing to comply with applicable reporting and monitoring requirements;

      b.    Failing to design, manufacture, formulate, label, and package their Paraquat products to make it less likely that Plaintiff Eide would be exposed to Paraquat;

    c.      Failing to perform adequate testing regarding consumer and user exposure to Paraquat products;

    d.      Failing to warn Plaintiff Eide of the risk of Parkinson's Disease, among other risks, that could result from Paraquat exposure; and

    e.      Continuing to manufacture, distribute, and/or sell their Paraquat products despite their knowledge of these risks and failures to comply with the facts above.

117.    The foreseeable risks of harm posed by the Paraquat product could have been reduced or avoided by the adoption of a reasonable alternative design by Defendants.

118.    At all relevant times, Plaintiff Eide's exposure to Defendants' Paraquat products was in a manner that was intended or directed by or reasonably foreseeable to Defendants.

119.    Defendants' prevented Plaintiff Eide from discovering causal link between Paraquat and her injury by concealing their Paraquat products' defective condition.

120.    Defendants' breaches of duty proximately caused the Plaintiff Eide to be at an increased risk of developing Parkinson's Disease.

121.    Defendants' breaches caused Plaintiff Eide to be at an increased risk for developing Parkinson's and in need of ongoing  medical monitoring.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Debra Eide respectfully requests that the Court enter judgment in her favor and against Defendants, awarding:

    a)    Consequential damages and ascertainable losses in such amount to be determined at trial and as provided by applicable law;

b) Exemplary and punitive damages sufficient to punish and deter Defendants and others from future deceptive, fraudulent, unfair, misleading, illegal and fraudulent practices;

c) Pre-judgment and post-judgment interest;

d) Costs including reasonable attorneys' fees and costs, court costs, and other litigation expenses; and

e) Any other relief the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff Eide demands a trial by jury on all of the triable issues within this pleading.

Respectfully submitted,

Dated:  March 2, 2022

/s/Wesley T. Graham_____
Joseph G. Gamble    AT0009417
Wesley T. Graham AT0011184
DUNCAN GREEN, P.C.
400 Locust Street, Suite 380
Des Moines, IA 50309
Telephone:  (515) 288-6440
Facsimile:  (515) 288-6448
wtgraham@duncangreenlaw.com
jgamble@duncangreenlaw.com
ATTORNEYS FOR PLAINTIFF